**No. 22-17008**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

KRISTIN HART, individually and as co-successor-in-interest to
Decedent KYLE HART, et al.,

Plaintiffs – Appellees,

v.

CITY OF REDWOOD CITY, a Municipal Corporation, ROMAN GOMEZ,
individually and in his official capacity as a Police Officer for the CITY OF
REDWOOD CITY,

Defendants – Appellants.

---

On Appeal from the United States District Court
Northern District of California
Case No. 4:21-cv-02653-YGR
The Honorable Yvonne Gonzalez Rogers

---

**APPELLEES' PETITION FOR REHEARING EN BANC**

---

JOHN L. BURRIS, SB# 69888
BENJAMIN NISENBAUM, SB #222173
AYANA C. CURRY, SB #209125
Law Offices of John L. Burris
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Fax:  (510) 839-3882

Attorneys for Plaintiffs-Appellees

# TABLE OF CONTENTS

Table of Authorities ................................................................iv

Introduction and Rule 35 Statement ..........................................1

Petition for Rehearing En Banc .................................................3

**I. Factual Background** ...........................................................**3**

    1. Kyle Hart Suffered a Mental Break ...................................3

    2. The Officers Tell a Harrowing and Inconsistent Tale ................3

    3. The Officers' Versions of the Story are Belied by the Physical Evidence and Contradicted by Eyewitness Testimony ...................................6

**II. Argument** .......................................................................**7**

A. The Panel Wrongly Determines that it has Jurisdiction Over this Appeal and Weighs the Evidence to Find the Officer's Use of Deadly Force was Objectively Reasonable ......................................................................7

    1. The Panel Ignores Evidence that Contradicts the Central Fact it Found to be Material .........................................................8

    2. The Officers' Credibility is a Threshold Issue that the Panel Ignored ........9

    3. The Panel Disregards Other Facts that Favor Plaintiffs ............................11

B. The Panel Misapplies the Law ..........................................................14

    1. The Panel Misconstrues the Severity-of-the-Crime-at-Issue Doctrine .....14

2. The Panel Eschews Pre-Shooting Tactics as a Factor in the Totality of the Circumstances .................................................................................................. 15

3. The Constitutional Violation At Issue is Clearly Established .................. 17

**III. Conclusion ............................................................................................ 18**

Certificate of Compliance ........................................................................... 19

Panel Opinion .............................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 1, 7

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001)................................................ 15, 16, 17

*Easley v. City of Riverside*, 765 F. App'x 282 (9th Cir. 2019)................................................7

*Estate of Anderson v. Marsh*, 985 F.3d 726 (9th Cir. 2021) .............................................. 2, 7

*George v. Morris*, 736 F.3d 829 (9th Cir. 2013) ...................................................................17

*Glenn v. Washington County*, 673 F.3d 864 (9th Cir. 2011)................................................17

*Hayes v. County of San Diego*, 736 F.3d 1223 (9th Cir. 2013) ........................................ 9, 18

*Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017) .................................................14

*Miller v. Clark County*, 340 F.3d 959 (9th Cir. 2003) ..........................................................14

*Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019) ........................................................passim

*Newmaker v. City of Fortuna*, 842 F.3d 1108 (9th Cir. 2016) ......................................... 9, 12

*Tolan v. Cotton*, 572 U.S. 650 (2014) .......................................................................1, 7, 8

*Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011) ....................................................12

*Vos v. City of Newport Beach*, 892 F.3d 1024 (9th Cir. 2018)..............................9, 14, 16, 17

**Other Authorities**

Ninth Cir. Model Civ. Jury Instr. § 1.14 (2023 ed.) ..........................................................10

**Rules**

Federal Rules of Appellate Procedure, Rule 35 ...................................................................1

## INTRODUCTION AND RULE 35 STATEMENT

On April 19, 2024, the panel issued a published opinion reversing the district court's denial of qualified immunity to Defendant Roman Gomez and found the officer's conduct, of shooting and killing Kyle Hart—a man actively committing suicide—was reasonable and not a clearly established violation of the Constitution. In so finding, the panel fails to view the evidence and draw reasonable inferences in Plaintiffs' favor. Plaintiffs respectfully request an en banc rehearing because the panel's decision contradicts well-established caselaw authority from this Circuit and the Supreme Court regarding appellate jurisdiction, the standard of review for summary judgment, and qualified immunity. En banc consideration is therefore necessary to secure and maintain uniformity of the Court's decisions. FRAP Rule 35.

On summary judgment "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (holding on summary judgment courts may not "weigh the evidence and determine the truth of [a] matter"). The Supreme Court has expressly held that summary-judgment standards are not different or lowered in the context of a claim to qualified immunity. Tolan, 572 U.S. at 657. This Court does not have jurisdiction to conduct the qualified immunity analysis taking the movant's version

of the event as true. *Estate of Anderson v. Marsh*, 985 F.3d 726, 734 (9th Cir. 2021).

The panel fails to credit evidence that contradicts its key factual findings and departs from this Court's authorities. Factually, the panel ignores Gomez's admission that he could have redeployed if Hart was walking and other eyewitness descriptions that Hart initially moved slowly and only ever walked. Legally, the panel eschews pre-shooting tactics as a valid consideration in the reasonableness analysis and directly contradicts this Court's findings that the time elapsed during a suspect's approach is not dispositive. *Nehad v. Browder*, 929 F.3d 1125 (9th Cir. 2019). As a result, this Circuit has opinions (*Hart* and *Nehad*) with very similar facts reaching opposite results on pre-shooting tactics: one adhering to this Court's caselaw authority finding that pre-shooting tactics are a legitimate reasonableness factor and clearly-established right and the other departing from these long-standing principles and failing to credit the nonmovant's evidence.

Essentially, the panel has published an opinion finding that police officers have no obligation (when they have ample opportunity) to create time and distance, redeploy or warn they will shoot when responding to a suicidal subject holding a knife who: has only harmed himself, is isolated and mortally injured and poses no danger to innocents, finding instead that officers in this situation can simply hold their ground and use deadly force—a notion not even espoused by the law

enforcement community. In so finding, the panel openly repudiates this Circuit's authorities.

## PETITION FOR REHEARING EN BANC

## I.    FACTUAL BACKGROUND

### 1.    *Kyle Hart Suffered a Mental Break*

On December 10, 2018, Plaintiff Kristin Hart discovered her husband Kyle Hart cutting his throat with a kitchen knife and bleeding profusely, he then walked to the back corner of their backyard, and continued cutting himself. 3-ER-367-368, 371-375. She called 911, followed Hart, and stayed on the phone throughout the encounter. 3-ER-369, 383-384.

Mrs. Hart greeted Officers Gomez and Velez in front of the house. 3-ER-374; 3-ER-401-402. Though she was covered in her husband's blood, but Mrs. Hart had not been injured or threatened by Hart. 3-ER-398, 400-401. The officers asked her where Hart was, she pointed to the backyard and, without asking Mrs. Hart for any additional information, they ran in that direction. 3-ER-374-375; 3-ER-398-401, 3-ER-440.

### 2.    *The Officers Tell a Harrowing and Inconsistent Tale*

According to the Officers, their only tactical plan was for Gomez to use his firearm and Velez her Taser. 3-ER-402; 3-ER-439-440. The officers knew another

officer was en route with a 40 millimeter, the ideal less-lethal tool for suicidal suspects holding a knife, but they did not wait for less-lethal to arrive. 3-ER-401.

The officers ran, with their weapons drawn, along the side of the house to the backyard. 3-ER-400-402. The path was muddy, but the officers did not slip. 3-ER-403-404. Gomez led, Velez was behind him, and Mrs. Hart followed the officers. 3-ER-404-405, 3-ER-443, 3-ER-375. The officers stopped when they reached the back corner of the house and observed Hart in the far corner of the yard. 3-ER-375-376. Between them stood a six foot patio table and chairs and a small children's play structure at the end of it. 3-ER-406, 3-ER-413, 3-ER-418.

Gomez claims that Hart had his back to the officers and the knife pointed down and upon Gomez's command to drop the knife, Hart turned, raised the knife and pointed it at and ran toward the officers[1], causing Gomez to fire five shots, and causing Hart to land at Gomez's feet. 3-ER-410-423; 4-ER-800. Gomez did not warn Hart that he would shoot him or consider tactical repositioning or changing his location to create time and distance; instead, he shot his firearm simultaneous to Velez deploying her Taser. 3-ER-407; 3-ER-428; 4-ER-793. Gomez testified that he did not reposition or create time and distance because Hart was running at him. Gomez admitted that if Hart had been walking, he would have presented a

---

[1] However, during his OIS interview, Gomez said that Hart initially moved with the knife at his side and raised it as he moved toward the officers. 3-ER-494.

lesser level of threat and he would have been able to move away from Hart and use the available less-lethal and de-escalation tactics. 3-ER-415, 420-422.

Velez testified that, initially, Hart was facing the officers and holding the knife in his right hand at shoulder height with the blade pointed up—not with his back to them and the knife down at his side. 3-ER-445-449, 452. Velez deployed her Taser when Hart was 10-15 feet away. 3-ER-472 at 18:02.[2] During her OIS interview, Velez indicated that Hart slowly walked towards them with the knife pointed up, and picked up his pace to a brisk walk. 3-ER-472 at 17:24, 18:43-19:25. Plaintiffs deposed Velez immediately after Gomez where he admitted that if Hart had been walking he would have been less of a threat. 3-ER-387, 434. During her deposition, Velez attenuated her original description of Hart's movement and claimed that it was relative and someone could consider him to have been running. 4-ER-449. Ultimately, Velez admitted that the description she provided in her OIS interview was correct—that is, Hart first walked slowly, then briskly walked but he never ran. 3-ER-449-452.

Velez also testified that Hart was upright when she aimed center mass. 3-ER-453-454. According to Velez, her Taser did not have any effect on Hart, he continued to walk towards the Officers, and then Gomez opened fire—that is, she

---

[2] Citations to Velez's OIS interview are by the page of the manual submission in the Excerpts and by audio recording timestamp.

took all of her actions before Gomez fired a single shot. 3-ER-472 at 18:16-18:41; 3-ER-452; 3-ER-468-469. Hart fell five feet to the left of Velez in the muddy area—meaning Hart did not fall at Gomez's feet, instead Velez was in-between Hart and Gomez. 3-ER-472 at 21:12-21:30.

### 3. The Officers' Versions of the Story are Belied by the Physical Evidence and Contradicted by Eyewitness Testimony

Mrs. Hart testified that Hart was facing the group with the knife pointed at his own throat and that he moved forward slowly when Gomez ordered him to drop the knife. 4-ER-375-379. Mrs. Hart then turned to check on her unattended children, took a few steps and heard gunshots. 3-ER-376-377.

Plaintiff's forensic expert examined the 911 audio recording and opined that the Taser and the first gunshot were fired virtually simultaneously. 3-ER-477-478. This suggests that: 1) the officers were unable to register that the Taser was ineffective and then decide to use the firearm only as a last resort, and 2) Hart was not able to take several steps between the Taser deployment and first gunshot. Thus making Velez's testimony on these points improbable.

Only one of the Taser probes connected with Hart behind his left ear, suggesting he was not upright when the taser was fired. The other barb was located 17 feet from the officers' location, suggesting Hart was a greater distance away when shot. 3-ER-511, 516; 3-ER-545.

Gomez fired five shots and three bullets struck Hart. 3-ER-512. One of the bullets entered the left side of Hart's back and traveled from his back to the front of his body, left to right at a 45 degree angle, also suggesting he was not straight on or upright when one of the gunshots was fired. 3-ER-556-559.

## II.    ARGUMENT

### A.    *The Panel Wrongly Determines that it has Jurisdiction Over this Appeal and Weighs the Evidence to Find the Officer's Use of Deadly Force was Objectively Reasonable*

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge…." *Id.* at 255. "Although a qualified immunity 'defense should be resolved as early as possible,' [citation], the general rules concerning "a 'judge's function' at summary judgment" continue to apply." *Easley v. City of Riverside*, 765 F. App'x 282, 283–84 (9th Cir. 2019) (citing *Tolan v. Cotton*, 572 U.S. 650 (2014)). This Court "may not review on interlocutory appeal 'the question whether there is enough evidence in the record for a jury to conclude that certain facts are true.'" *Estate of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021).

To overcome the appellate jurisdictional bar, the panel finds that Plaintiffs cannot contradict the officers' testimony that Hart raised and pointed the knife at them and that the purported fact disputes identified by Plaintiffs are immaterial or speculative.

## 1. The Panel Ignores Evidence that Contradicts the Central Fact it found to be Material

The panel finds that the factual disputes identified by Plaintiffs are not material and that "in light of the undisputed material facts, neither prong [of the qualified immunity analysis] is satisfied." (Opinion p. 11.) In so finding, the panel ignores evidence and fails to give weight to facts that directly contradict its assertion of materiality. *Tolan*, 572 U.S. at 657 (reversing the Fifth Circuit because it failed "to credit evidence that contradicted some of its key factual conclusions, [and] improperly "weigh[ed] the evidence" and resolved disputed issues in favor of the moving party").

The panel determines that "whether Hart's pace was specifically a run or a brisk walk is immaterial given he crossed the yard to within close range of the officers in less than 5.9 seconds." (Opinion p. 14.) This determination ignores the evidence most favorable to Plaintiff (the nonmovant)—i.e., Gomez's admission that if Hart had been walking he could have redeployed elsewhere in the backyard. Gomez's characterization that Hart was immediately running is contradicted by

Mrs. Hart and Velez who say Hart initially moved slowly, and by Velez who says he graduated to a brisk walk but never ran.

This is significant because the panel presumes the shooting and when Gomez chose to fire his gun were reasonable based on the time that elapsed during Hart's approach. The panel departs from this Court's caselaw authority that when a suspect is armed and approaching quickly does not, by itself, warrant deadly force. *Hayes v. County of San Diego*, 736 F.3d 1223, 1233-34 (9th Cir. 2013) (suspect with a knife and blank stare shot within 8 seconds; *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (knife-wielding suspect shot within 8 seconds); *Nehad v. Browder*, 929 F.3d 1125, 1131 (9th Cir. 2019) (advancing suspect believed to be carrying a knife shot within five seconds).

## 2.    *The Officers' Credibility is a Threshold Issue that the Panel Ignored*

"[S]ummary judgment is not appropriate in § 1983 deadly force cases that turn on the officer's credibility that is genuinely in doubt." *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1116 (9th Cir. 2016).

Gomez testified that he stepped to his left so that Velez was on his right. 3-ER-405, 407, 418; 3-ER-495. Whereas, Velez is clear that she stood to Gomez's left side. 3-ER-472. The panel found that "which side of the path each officer stood on is immaterial to the inquiry of whether Hart posed an immediate threat to the officers." (Opinion p. 13.) Upon first seeing Hart, Gomez testified that Hart's back

was turned and the knife was down at his side, Velez said Hart was facing the group with the knife raised and pointed at them, and Mrs. Hart testified that Hart was facing them and held the knife at his own throat. The panel found that how Hart "was holding the knife when the officers first encountered him" is immaterial. (Opinion p. 13.) However, these discrepancies are material and germane to the Officers' recall of the event and their credibility.

Additionally, Velez's duplicity—that she observed Hart walking slowly then briskly but someone could believe he was running—directly implicates her credibility. See *Nehad*, 929 F.3d at 1133 (finding inconsistencies in the officer's on scene report and his OIS interview days later after consulting with his attorney "give[s] rise to genuine doubts about Browder's credibility").

The panel finds how Hart held the knife as he approached the officers to be "the material issue" and found factually that "[Hart] approached the officers, holding the knife out towards them." (Opinion p. 13-14.) However, the panel necessarily credits the officers' testimony to make this factual determination, as the only evidence that Hart ever pointed the knife toward the officers is the officers' testimony. The jury can disbelieve Gomez's testimony that Hart was running, raised the knife and pointed it at the officers—particularly given the inconsistencies in Gomez's testimony. Ninth Cir. Model Civ. Jury Instr. § 1.14 (2023 ed.). Mrs. Hart observed Hart facing the group with the knife pointed at his

neck, moving slowly toward the officers and within a few seconds of turning, she heard gunshots. 4-ER-375-376, 378-379. Viewing the evidence in the light favorable to the non-movant and given the differing stories that the officers tell, a jury can determine that Hart pointed the knife toward his neck as he slowly traversed the yard.

### 3.     *The Panel Disregards Other Facts that Favor Plaintiffs*

The panel finds that the Officers responded to an emergency situation and appear to blame Mrs. Hart's frantic demeanor for the Officers' hasty entry into the backyard. (Opinion p. 13, 16 "they walked down a path to the backyard at the frantic urging of Plaintiff," "[t]hey were immediately urged to help by the victim's 'very, very upset' and 'very animated' wife".) This characterization ignores contradictory evidence. Mrs. Hart testified that the Officers asked "where is he?" she pointed to the backyard and they rushed that way without asking any follow-up questions. 3-ER-374-375. Indeed, Mrs. Hart expressed bewilderment at the Officers' lack of communication. *Id.* And Plaintiffs' police practices expert (Bercovici) opined that the officers' lack of tactical planning led to their unreasonable use of deadly force. 3-ER-573. The panel departs from this Court's authorities that an officer's hasty response even when responding to an emergency to be unreasonable. *Nehad*, 929 F.3d at 1135 ("reasonable triers of fact can...,conclude that an officer's poor judgment or lack of preparedness caused him

to act unreasonably, 'with undue haste.'") (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1126 (9th Cir. 2011).

Plaintiffs argued that Hart was 15 to 17 feet away from the officers when they fired their weapons, as one of the Taser barbs was found 15 to 17 feet away from the officers. The panel finds that "the errant barb land[ing] 17 feet away is not evidence that Hart himself was that far away," and determines "[c]onsistent with the officer's testimony, Hart could have been significantly closer and the taser barb simply flew past and landed beyond him." (Opinion p. 17.) Here the panel expressly credits the officers' testimony to find that the Taser barb was "errant." Drawing the inference in favor of Plaintiffs, the Taser barb hit Hart, failed to stick to him, and fell straight down to the ground, indicating that Hart was 15 to 17 feet away when he was shot.

The panel disregards key physical evidence that one of Gomez's bullets struck Hart in the back and the Taser barb lodged behind Hart's left ear. This Court routinely finds a material fact question where the physical evidence does not corroborate parts of an officers' testimony. See e.g., *Newmaker*, 842 F.3d at 1116-17 (finding "a reasonable jury could conclude, given the trajectory of the bullets through Newmaker's body, that even if Newmaker had grabbed the baton Officer Soeth could not have fired his first shot while Newmaker was standing up and swinging the baton.") By contrast, the panel credits Defendant's expert opinion

that the bullet trajectory is consistent with the Officers' testimony. (Opinion p. 17.)
A jury can reject Defendant's expert and find that a bullet and Taser barb to Hart's
back necessarily means that the Officers did not only shoot Hart straight on as they
allege. It was improper for the panel to rely on Defendant's expert's interpretation
of the physical evidence over the physical evidence itself and then weigh this
evidence in favor of the movant.

Most brazenly, the panel misrepresents Bercovici's testimony as conceding
Hart posed a threat to the officers. (Opinion p. 17-18.) In fact, Bercovici scorned
that Hart was only a threat if the officers' feet were stuck in cement and their
brains were not functioning. 4-ER-619-626.

## B.     The Panel Misapplied the Law

In addition to factually finding Hart to be an immediate threat to Gomez, the
panel wrongly finds all other Graham factors favor the officer. Plaintiffs only
highlight the factors where the panel overtly misapplies and distorts this Court's
long standing caselaw authority.

### 1.     *The Panel Misconstrues the Severity-of-the-Crime-at-Issue Doctrine*

The panel finds that by approaching the officers with a knife and refusing to
drop it, Hart committed the crimes of assault and resisting arrest, and because these
crimes happened in the Officers' presence, the severity-of-the-crime-at-issue factor
favors Gomez. (Opinion 19-21.) In so finding, the panel misconstrues the severity-

of-the-crime factor. This factor concerns the underlying reason the police are called to the scene. *Vos*, 892 F.3d at 1031, fn. 6 (finding "the officers were not responding to the report of a crime" but rather were "contacted because of Vos's erratic behavior"). This Court has rejected similar arguments that this factor favors the movant by suggesting that the decedent could have been charged with a serious crime had he survived his encounter with the police. *Id*.

Instead, this Court analyzes the severity-of-the-crime factor in two ways: 1) the *Miller* way-where a particular use of force would be more reasonable when applied against a felony suspect than when applied against a misdemeanant (*Nehad*, 929 F.3d 1136 (citing *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)); or 2) as a proxy – as in *Lowry v. City of San Diego*, 858 F.3d 1248, 1257 (9th Cir. 2017). The panel strains to apply *Lowry*, claiming that Hart's on-going crimes of assault and resisting arrest occurred in the officers' presence. *Lowry* is inapplicable because the police responded to a silent burglar alarm that was tripped after business hours and found the business's door open. *Lowry*, 858 F.3d 1257-58. There, the underlying crime and reason for service was a suspected burglary. Here, the panel completely ignores that the underlying reason for the call for service was that Hart was cutting and harming himself—i.e., his erratic behavior not a crime. This factor favors Plaintiffs.

## 2. The Panel Eschews Pre-Shooting Tactics as a Factor in the Totality of the Circumstances

The panel twists itself into a pretzel both begrudgingly acknowledging that this Circuit analyzes pre-shooting tactics in its reasonableness analysis and simultaneously questioning the validity of pre-shooting tactics as a consideration[3]. (Opinion 22-24.) The panel dismisses Plaintiffs' failed-pre-shooting-tactics argument and find that Plaintiffs "simply argue that the officers could have moved to a different location in the yard." (Opinion p. 24.) First, this misrepresents the record and weighs the evidence. Plaintiffs provided evidence and established that the law required the Officers to redeploy and to develop a tactical approach plan. *Deorle v. Rutherford*, 272 F.3d 1272, 1282-1283 (9th Cir. 2001) (holding deadly force on an emotionally disturbed subject that has not harmed anyone else and is goading the police into a confrontation is objectively unreasonable because the officer did not consider other less intrusive available tactics such as retreat, de-escalation and failed to give a warning prior to using deadly force). Second, the panel wrongly finds that Plaintiffs speculate that repositioning was available. (Opinion p. 24.) The panel ignores Velez's testimony that the patio furniture

---

[3] The panel acknowledges that the Ninth Circuit "sometimes considers the pre-shooting conduct" but then curiously cites all of the Circuits that do not consider it. (Opinion p. 23 fn. 5.) Tellingly, the panel fails to acknowledge the other Circuits that consider pre-shooting conduct in their reasonableness analysis.

provided a barrier when Hart was on the other side of it (3-ER-455; 3-ER-465-466), and Gomez's testimony that the officers moved to their right into the roomy backyard when he shot Hart and his admission that he would have repositioned in the yard if Hart had been walking (3-ER-496), directly refuting the panel's "speculation" finding.

In addition, the panel reveals a fundamental misunderstanding of pre-shooting tactics, finding "even if [the officers] had repositioned within the backyard, there is no evidence to indicate that Hart would have been then unable to continue to approach them with the knife." (Opinion pp. 23-24.) This Court has never required redeployment to extinguish any possible future threat. The panel appears to rely on its own speculation that reasonable alternatives including redeployment, de-escalation and less-lethal alternatives would not have worked.

### 3. The Constitutional Violation At Issue is Clearly Established

The panel departs from this Court's previous applications of its authorities in finding that Gomez did not violate a clearly established law. (Opinion p. 25-28.)

The panel dismisses *Deorle* and *Vos* as clearly establishing the law, in part, because those officers had 30-40 minutes and 20 minutes respectively to plan their approach to the suspect. (Opinion p. 26-27.) This Court recently rejected an officer's attempt to distinguish *Deorle* based on the comparatively short amount of time the officer observed the suspect before using deadly force. *Nehad*, 929 F.3d at

1141 ("Browder could have taken more time to evaluate the situation, Browder's brief observation of Nehad before using lethal force only makes Browder's conduct less reasonable.").

More importantly, *Deorle*, *Vos* and *Nehad* stand for principles that the panel completely disregards—this Court has long required officers to retreat, redeploy, create time and distance, and warn suspects that they will use deadly force particularly when dealing with emotionally disturbed suspects attempting to commit suicide-by-cop, who have not harmed anyone else. *Deorle*, 272 F.3d at 1282. This Court has maintained this principle even when the suspect is approaching the police at a steady gait armed with what appears to be an edged weapon. *Deorle*, 272 F.3d at 1284 (suspect walked in officer's direction at a steady gait with a bottle in his hand); *Vos*, 892 F.3d at 1034-36 (Vos ran at the officers with what they thought were scissors in his hand); *Nehad*, 929 F.3d at 1130-1131, 1134 (Nehad walked toward the officer at a steady pace holding a metallic pen and officer shot him from 17 feet away within five seconds of exiting his patrol car).

This Court has long held that other aspects of Gomez's conduct were clearly established constitutional violations. For example, mere possession of a weapon is not sufficient to justify the use of deadly force, "otherwise, that a person was armed would always end the inquiry." See e.g., *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013)

(finding where the decedent was acting erratically and had a gun but did not point it at the officers, clearly establishes that officers cannot shoot and kill a person without warning and without objective provocation). This includes when the suspect is suicidal and walking in the direction of the officer with a knife upraised. See, *Hayes*, 736 F.3d at 1233-34 (reversing a district court's grant of summary judgment where a victim approached officers while armed with a knife, but where the suspect "was not charging them," "had not been ordered to stop," "was given no warning," and was not witnessed acting erratically with the weapon).

## III.   CONCLUSION

Given the foregoing, Appellees request that this Court grant their Petition for Rehearing En Banc.

Dated: June 3, 2024                     Law Offices of John L. Burris


By:            /s/ Ayana Curry
                 Ayana Curry
                 Attorneys for Appellees

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** _____22-17008_____

     I am the attorney or self-represented party.

     I certify that pursuant to Circuit Rule 35-4 or 40-1, the attached petition for

panel rehearing/petition for rehearing en banc/response to petition is *(select one)*:

[x] Prepared in a format, typeface, and type style that complies with Fed. R. App. P.

    32(a)(4)-(6) and **contains the following number of words:** _4160_____**.**

    *(Petitions and responses must not exceed 4,200 words)*

**OR**

[ ] In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** _____/s/ Ayana Curry_____**Date** _____June 3, 2024_____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11**                                                             *Rev. 12/01/21*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| KRISTIN HART, individually and as co-successor-in-interest to Decedent KYLE HART; E.H., individually and as co-successor-in-interest to Decedent KYLE HART; W.H., individually and as co-successor-in-interest to Decedent KYLE HART, | No. 22-17008 |
| | D.C. No. 4:21-cv-02653-YGR |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| CITY OF REDWOOD CITY, a municipal corporation; DANIEL MULHOLLAND, individually and in his capacity as Chief of Police for the CITY OF REDWOOD CITY; ROMAN GOMEZ, individually and in his official capacity as a Police Officer for the CITY OF REDWOOD CITY; LEILA VELEZ, individually and in her official capacity as a Police Officer for the CITY OF REDWOOD CITY, | |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted February 12, 2024
San Francisco, California

Filed April 19, 2024

Before:  Eric D. Miller, Bridget S. Bade, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge VanDyke

---

## SUMMARY[*]

---

### Deadly Force/Qualified Immunity

The panel reversed the district court's denial, on
summary judgment, of qualified immunity to City of
Redwood City Police Officer Gomez in an action alleging
constitutional and state law violations arising from the
deadly shooting of Kyle Hart.

Officers Gomez and Velez responded to a call involving
a man attempting suicide with a knife in his backyard.  When
they arrived, they found the man's wife covered in blood and
frantically pleading for help.  At her urging, the officers went
to the backyard, where they found Hart holding a

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

knife.  They told him to drop the knife, but instead of doing so he began moving towards them with the knife raised.  As Hart neared the officers, Officer Velez deployed her taser, but it was ineffective.  With Hart approaching closely and wielding a knife, Officer Gomez shot and killed him.

As an initial matter, the panel held that it had jurisdiction because both whether the disputed facts were material and whether qualified immunity applied were questions of law subject to the court's jurisdiction.

The panel held that Officer Gomez was entitled to qualified immunity.  Plaintiffs failed to show that Officer Gomez's conduct was objectively unreasonable and therefore a violation of Hart's Fourth Amendment rights.  Hart posed an immediate threat when he rapidly approached the officers brandishing a knife and refusing commands to drop it.  Moreover, even if Officer Gomez's conduct violated the Fourth Amendment, he would still be entitled to qualified immunity because the conduct did not violate clearly established law.  None of the cases plaintiffs identified would have put Officer Gomez on notice that his actions in this case would be unlawful.

---

## COUNSEL

Benjamin Nisenbaum (argued), John L. Burris, and Ayana C. Curry, Burris Nisenbaum Curry & Lacy LLP, Oakland, California, for Plaintiffs-Appellees.

Kevin E. Gilbert (argued) and Carolyn M. Aguilar, Orbach Huff & Henderson LLP, Pleasanton, California; Mark G. Bonino and Donald L. Hall, III, Hayes Scott Bonino Ellingson Guslani Simonson & Clause LLP, San Carlos,

California; Stephen P. Ellingson, Hayes Scott Bonino Ellingson & McLay LLP, Redwood City, California; for Defendants-Appellants.

---

## OPINION

VANDYKE, Circuit Judge:

Officers Gomez and Velez responded to a tragic call involving a man attempting suicide with a knife in his backyard. When they arrived, they found the man's wife covered in blood and frantically pleading for help. At her urging, the officers went to the backyard, where they found Hart holding a knife. They told him to drop the knife, but instead of doing so he began moving towards them while raising the knife. As Hart neared the officers, Officer Velez deployed her taser, but it was ineffective. With Hart approaching closely and wielding a knife, Officer Gomez took action to protect himself and his partner, shooting Hart. Medical assistance was called for Hart, but he ultimately passed away in the emergency room. Hart's family brought suit alleging that Gomez, Velez, and the City of Redwood City violated their and Hart's constitutional and state law rights. The parties filed cross-motions for summary judgment, and as relevant here, the district court found that Officer Gomez was not entitled to qualified immunity.

We conclude that the district court erred in denying qualified immunity. As an initial matter, we have jurisdiction over the case because both whether disputed facts are material and whether qualified immunity applies are questions of law subject to our jurisdiction. And Officer Gomez is entitled to qualified immunity because Plaintiffs

have failed to show either that his conduct was objectively unreasonable, and therefore a violation of Hart's Fourth Amendment rights, or that such rights were clearly established by precedent existing at the time of the conduct.

## I.

On December 10, 2018, plaintiff Kristin Hart (Plaintiff, and together with her children, Plaintiffs) heard one of her two children crying and called out to her husband Kyle Hart (Hart) to help comfort the child. When she did not hear a response, Plaintiff went into the kitchen to check on Hart and found him using a "serrated utility knife" to cut at his own throat while their son watched. Plaintiff told Hart "many times" to stop cutting himself; Hart lowered the knife several times, but each time resumed cutting himself.

Eventually, Plaintiff managed to take the knife from Hart. She began searching for her cell phone to call 911, but when she could not find it, Hart gave her his phone. She called 911, but as she did Hart retrieved a different knife and again began cutting at his throat. Plaintiff told the 911 dispatcher that her husband was committing suicide by cutting his throat and his wrists. While she was on the phone, her husband went into the backyard, and continued to cut himself on the throat, arms, and chest.

Officers Roman Gomez and Leila Velez were the first to arrive on the scene. Plaintiff met them in the front yard, uninjured, but covered in blood and frantically pleading for them to help Hart. Because Gomez was senior, he took the lead and instructed Velez "to go less lethal with the taser" while he "would go lethal with [his] firearm."[1] The officers

---

[1] Another officer was enroute with a "40 millimeter less lethal" weapon but did not arrive until some time later.

asked Plaintiff where Hart was and immediately ran in the direction she pointed.

The officers took a narrow, muddy path on the left side of the house to reach the backyard. Gomez took the lead, holding his firearm "low ready" while Velez came behind him with her taser. Plaintiff followed behind them. While the parties agree on the broad strokes of what happened next, their testimonies vary regarding certain details.

Gomez stated that he approached the backyard from the "middle left" side of the pathway to give himself a better view of the yard as he rounded the corner. Although he did not look to see Velez's position behind him, he assumed that because he was to the left, she was behind him and to his right. Velez, on the other hand, stated that she was on Gomez's left side, rather than his right. They found Hart standing in the backyard holding a knife. Plaintiff stated that Hart was standing in the back corner of the backyard, holding the knife to his throat. Gomez said that the first time he saw Hart, the man was standing on the other side of some patio furniture and a small child's play structure, facing away from them and holding the knife down from his side. Velez indicated that Hart was facing them and holding the knife out at shoulder height.

Gomez yelled "drop the knife" twice. Instead of dropping the knife, Hart began moving towards the officers while still holding the knife. Plaintiff remembered seeing Hart move toward the officers, but at that point she realized her children were unattended, so she left to check on them. Plaintiff did not see the shooting. Gomez said that Hart came towards them at a slow run, holding the knife out towards the officers, going from thirty feet away to eight or ten feet away in "approximately five seconds." Velez characterized

Hart's pace as a "brisk walk." What is not disputed—and was recognized by Plaintiffs' own expert—is that Hart went from his starting position across the yard to where he eventually ended up only a few feet from the officers in less than 5.9 seconds.

The officers did not warn Hart that they would shoot, but with him approaching and wielding a knife, they took action to protect themselves. Velez testified that she fired her taser at Hart before any shots were fired. She said that Hart was still upright and holding the knife up at them when she fired the taser. One taser probe struck Hart on the left side of his head, and the other missed, passing Hart and landing 17 feet away from the officers. Because contact with both probes is required for the taser to function, the taser had no effect on Hart.

Velez testified that Gomez only fired after the taser failed to make contact with Hart. Gomez, however, stated that he fired his "firearm simultaneously to when Officer Velez fired her taser." Regardless of the timing, the taser was ineffectual, and Gomez fired five shots, striking Hart three times in the upper torso. Velez stated that, after Hart was shot, he fell to the ground five feet to her left; Gomez stated that Hart fell at his feet. Paramedics were already enroute when Gomez requested medical assistance. The paramedics transported Hart to an emergency room, but he was ultimately pronounced dead.

While there are some discrepancies regarding the details of the incident, the material facts are not in dispute. When Officers Gomez and Velez arrived at Hart's residence, Plaintiff was covered in blood and frantic. At her urging, the officers went along the side of the house to the backyard, where they found Hart holding a knife. Gomez told Hart to

"drop the knife." Instead of complying, Hart began moving towards the officers while still holding the knife. As corroborated by the officers' testimony, Plaintiffs' expert, and the 911 call recording, Hart crossed the backyard to within a few feet of the officers in less than 5.9 seconds. Viewing Hart—who advanced on them with a knife—as an imminent threat,[2] Velez fired her taser, but this was ineffective because only one probe made contact with Hart. Gomez fired five shots, striking Hart three times in the upper torso. Hart fell to the ground near the officers, was provided emergency medical assistance, but was pronounced deceased upon arrival at an emergency room.

In April 2021, Plaintiffs filed their complaint alleging that Gomez, Velez, their chief of police, and the City of Redwood City (collectively, Defendants) violated their and Hart's constitutional and state law rights. The parties filed cross-motions for summary judgment, which the district court denied except as to certain claims asserted against Velez under 42 U.S.C. § 1983. Relevant to this appeal, the district court found that the officers were not entitled to qualified immunity.

In making this determination, the district court relied on this court's previous statement that "[e]very police officer should know that it is objectively unreasonable to shoot … [1] an unarmed man who: [2] has committed no serious offense, [3] is mentally or emotionally disturbed, [4] has been given no warning of the imminent use of such a significant degree of force, [5] poses no risk of flight, and [6] presents no objectively reasonable threat to the safety of the officer or other individuals." *Deorle v. Rutherford*, 272

---

[2] At his deposition, Plaintiffs' expert conceded that Hart posed an imminent threat to the officers.

F.3d 1272, 1285 (9th Cir. 2001). The district court found, viewing the facts in the light most favorable to Plaintiffs, that these factors were met because "Hart had committed no offense, was suicidal, was not a flight risk, did not pose a threat to others, and a dispute exists regarding whether an adequate warning that force would be used by the officers was given." While it was undisputed that Hart was holding a knife, the district court found that "he was not necessarily 'armed' as the term is commonly understood." The district court further concluded that, even if Hart was armed, under the law at the time of the incident, it may have still been unreasonable for Gomez to use lethal force on the basis that Hart may have been mentally unstable. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033 (9th Cir. 2018).

Defendants filed a timely notice of appeal in December 2022, appealing only the Fourth Amendment claim. We therefore do not address the state law claims.

## II.

We have jurisdiction under 28 U.S.C. § 1291. Courts "normally have no jurisdiction to hear interlocutory appeals from the denial of summary judgment … [b]ut an exception arises where the movant was denied summary judgment based on qualified immunity." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 944 (9th Cir. 2017) (citations omitted). Such denials of qualified immunity are considered "final decisions" under the collateral order doctrine because qualified immunity is immunity from suit itself and so would not be properly vindicated by an appeal after final judgment. *Id.* at 944–45. We review "the district court's conclusions regarding qualified immunity *de novo*" and consider "disputed facts in the light most favorable to the nonmoving party." *Id.* at 946.

## III.

The district court erred in denying Defendants' motion for summary judgment on the ground that Officer Gomez is not entitled to qualified immunity. As an initial matter, we have jurisdiction to hear this appeal even though a purported dispute of material facts exists because determining the materiality of disputed facts is a question of law over which we have jurisdiction. And in light of the undisputed material facts, Officer Gomez is entitled to qualified immunity because Plaintiffs have shown neither (1) that Officer Gomez's conduct was objectively unreasonable and therefore a violation of Hart's Fourth Amendment rights, nor (2) that such rights were clearly established by precedent existing at the time of the conduct.

## A.

That a purported dispute of material facts exists is not enough to divest us of our jurisdiction in this case. *See Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996). If it were, then every denial of summary judgment based upon "controverted issues of material fact" would be "nonappealable." *Id.* But "summary judgment determinations *are* appealable when they resolve a dispute concerning an abstract issue of law relating to qualified immunity," even when the underlying conduct is controverted. *Id.* at 313 (internal citation and quotations omitted). "In other words, we have jurisdiction to review an issue of law determining entitlement to qualified immunity— even if the district court's summary judgment ruling also contains an evidence-sufficiency determination—but not to accede to a defendant's request that we review that evidence-sufficiency determination on appeal." *Estate of Anderson v. Marsh*, 985 F.3d 726, 731 (9th Cir. 2021).

While appellate review "does not extend to claims in which the determination of qualified immunity depends on disputed issues of material fact," "*any* issue of law, including the materiality of the disputed issues of fact, is a permissible subject for appellate review." *Jeffers v. Gomez*, 267 F.3d 895, 903, 904 (9th Cir. 2001). Once the materiality of the facts is determined, we "assume[] the version of the material facts asserted by the non-moving party to be correct." *Id.* at 905 (quoting *Schwenk v. Hartford*, 204 F.3d 1187, 1195 (9th Cir. 2000)). And in doing so, we may "consider facts offered by the defendant that are uncontradicted by any evidence in the record." *Hopson v. Alexander*, 71 F.4th 692, 697 (9th Cir. 2023) (internal quotations omitted) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010)).

So here we have jurisdiction to both (1) determine whether the disputed facts are material and (2) consider whether Office Gomez is entitled to qualified immunity when the material facts are viewed in the light most favorable to Plaintiffs.

**B.**

Officer Gomez is entitled to qualified immunity. Qualified immunity protects government officials from suit unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). In this case, there are some factual disputes (though not as many as Plaintiffs say). But as explained below, they are not material. Ultimately, in the light of the undisputed material facts, neither prong is satisfied.

**1.**

Officer Gomez's actions were objectively reasonable. In determining whether "the use of force is contrary to the Fourth Amendment's prohibition against unreasonable seizures," the Supreme Court has instructed us to inquire "whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). To assess the reasonableness of a particular use of force, we balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.'" *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The nature of the intrusion here is a serious one. "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Because this is a clear intrusion of Hart's Fourth Amendment rights, our inquiry reduces to "whether the governmental interests at stake were sufficient to justify it." *Vos*, 892 F.3d at 1031.

The Supreme Court has provided three factors for determining the strength of the government's interest: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The "most important" of these factors is "whether the suspect posed an immediate threat to the safety of the officers or others." *Lal v. California*, 746 F.3d 1112, 1117

(9th Cir. 2014); *see also George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

**a.**

Beginning with the most important factor, *id*., Hart posed an immediate threat to Officer Gomez. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. So when determining whether Hart posed an immediate threat to Officer Gomez, the perspective of an officer *on the scene* must be considered.

When Officers Gomez and Velez arrived, they walked down a path to the backyard at the frantic urging of Plaintiff. Plaintiffs emphasize minor differences in testimony between Gomez and Velez as to where each stood relative to each other on the path, i.e., whether Velez stood to Gomez's right or left. But which side of the path each officer stood on is immaterial to the inquiry of whether Hart posed an immediate threat to the officers.

When the officers reached the backyard, they found Hart standing in the yard holding a knife. Plaintiffs again attempt to present a factual dispute, first noting that depending on whose testimony is considered, Hart was either standing on or behind a low dirt mound. But either way, Hart was initially at most 37 feet away from the officers. Plaintiffs next dispute how Hart was holding the knife. But they rely only on testimony about how he was holding the knife when the officers *first encountered him*. This is immaterial in light of two undisputed facts: (1) Hart *was* holding a knife when they first saw him and (2) Hart was holding the knife towards the officers as he *approached* them. As Officer Gomez did not employ lethal force until Hart approached them, how Hart

held the knife *at that point* is the material issue, and that issue is undisputed in the record.

Hart was non-communicative and failed to respond to or comply with Gomez's command to "drop the knife."[3] Instead, he approached the officers, holding the knife out towards them. Plaintiffs argue that whether Hart ran or briskly walked towards the officers is material to whether he posed a threat. But while this might be material under other circumstances, whether Hart's pace was specifically a run or a brisk walk is immaterial given he crossed the yard to within close range of the officers in less than 5.9 seconds. It is undisputed that Officers Gomez and Velez literally had only seconds to react to a non-responsive man quickly approaching them with a knife. Officer Gomez's decision to fire was based on Hart's failure to comply with commands, his approach, and his possession of a lethal weapon. Plaintiffs' asserted factual disputes do not eliminate any of these core, undisputed circumstances. These undisputed facts are what led Officer Gomez to reasonably believe that Hart posed an immediate threat to both himself and his partner.

This court has previously found it objectively reasonable to view an individual as an immediate threat in similar situations. For example, in *Blanford v. Sacramento County*, this court concluded that it was objectively reasonable for an officer to view an individual carrying a sword, attempting to enter a home, and failing to comply with verbal commands

---

[3] Plaintiffs now contest whether Officer Gomez said this twice or only once, based on the 911 dispatch recording. But Plaintiff herself testified she heard Gomez say it twice, and it is difficult to hear the officers at all on the 911 call recording. Regardless, Plaintiffs do not dispute that the command was, in fact, given at least once.

as an immediate threat, despite later determining that the individual lived in that home and did not hear the officer's commands because he wore headphones. 406 F.3d 1110, 1116 (9th Cir. 2005). Here, Hart similarly wielded an edged weapon and failed to comply with commands. And in *Lal*, police officers were involved in a car chase that culminated in a standoff where the individual, who had already hit himself "with a stone," approached them with a "football-sized rock" held over his head. 746 F.3d at 1117. As here, one officer requested less than lethal assistance, but they were forced to take action before assistance arrived. *Id.* at 1114. This court held that the officers were justified in believing that the individual approaching them with a blunt weapon was an immediate threat. *Id.* at 1117. If anything, here—where Hart carried a knife rather than a rock—the threat was greater. If the individuals in *Blanford* and *Lal* posed an immediate threat, it is difficult to conclude that Hart did not.

Plaintiffs make a number of arguments as to why Hart did not present an immediate threat, but each is unconvincing. Plaintiffs first argue that whether Hart was running or briskly walking is critical to whether he presented an immediate threat. But what is undisputed is that Hart crossed the entirety of the "roomy backyard" in a matter of seconds. So whether Hart was running or merely walking, there is no dispute that he quickly closed the distance between himself and Officer Gomez while wielding a lethal weapon.

In some tension with their argument that Hart was moving too slowly to present a threat to the officers, Plaintiffs also argue that the situation developed *too quickly*. Plaintiffs argue that "constitutional violations" are routinely found "when the shooting of an armed suspect happens

quickly." As Plaintiffs point out, this may be true when the "officers themselves … unnecessarily create their own sense of urgency," *S.R. Nehad v. Browder*, 929 F.3d 1125, 1135 (9th Cir. 2019) (internal quotations and modifications omitted), or where the police were quick to shoot despite having significant time to plan their actions, *see Vos*, 892 F.3d at 1034. But here, the officers responded to an emergency situation involving an armed individual. They were immediately urged to help by the victim's "very, very upset" and "very animated" wife, who directed them to Hart's location. And Officer Gomez did not engage in lethal force until Hart was approaching them with a knife held out towards them. The officers were responding quickly to an emergency, which led to a confrontation with a man who approached them while wielding a knife and refused to drop it when commanded. Nothing about the speed of events in this case eliminated Hart's immediate threat.

Plaintiffs also argue that because Hart had already harmed himself when the officers arrived, he presented less of a threat. Plaintiffs cite *Tan Lam v. City of Los Banos* for the proposition that one who is wounded may no longer present an immediate threat. 976 F.3d 986, 999 (9th Cir. 2020). In *Tan Lam*, the individual stabbed an officer with scissors. *Id.* The officer then shot the individual. *Id.* This court found that first shot to be an objectively reasonable use of force. *Id.* But then, after the individual "was injured *and was [no longer] approaching [the officer] with scissors*," the officer shot him again. *Id.* (emphasis added). At that point, this court determined that the individual was no longer an immediate threat. *Id.* Perhaps if Hart's injuries had made it so he could no longer approach the officers with the knife, then as in *Tan Lam*, Hart would not have been an immediate threat. But it is uncontroverted that Hart *was* able to

approach at least at a brisk walk, while wielding the knife in front of him.

Finally, Plaintiffs suggest that Hart was still "15 to 17 feet away" from the officers and falling to the ground when they fired their weapons. This assertion is belied by the record. Plaintiffs posit that because the taser probe that *missed* Hart was found 15 to 17 feet away, Hart must have been shot when he "was 15 to 17 feet away." But the mere fact that the errant barb landed 17 feet away is not evidence that Hart himself was that far away. Consistent with the officer's testimony, Hart could have been significantly closer and the taser barb simply flew *past* and landed beyond him.

Plaintiffs' assertion that Hart was falling when the officers first deployed their weapons likewise has no support in the record. Plaintiffs appear to base this claim solely on a misreading of the coroner's report, but the coroner's report does not opine on the bullet's trajectory in flight or Hart's position when struck. On the other hand, Defendants' expert opined without contradiction that "[t]he trajectory angle of the wound is not consistent with someone whose back is turned towards the officer," and that Gomez "would have stopped firing while Mr. Hart was still armed, still moving towards them, and still upright."

In short, Hart was clearly an immediate threat to the officers when he approached them while wielding the knife. Plaintiffs' own expert testified to this effect:

> Q. … Based upon your expert opinion and the information you reviewed, at any point did Mr. Hart pose an imminent

> threat to either Officer Veldez [sic],
> Officer Gomez, or anyone else?
>
> A. Yes.
>
> Q. And—let's be more specific, then. At
> any point, did Mr. Hart pose an imminent
> threat to Officer Veldez [sic]?
>
> A. He—yes.
>
> Q. At any point, did Mr. Hart pose an
> imminent threat to Officer Gomez?
>
> A. Yes.
>
> Q. At what point did Mr. Hart pose an
> imminent threat to Officer Gomez and/or
> Officer Veldez [sic]?
>
> A. When Mr. Hart began to walk towards
> them, they could have viewed that as an
> imminent threat.

Plaintiffs point out that, notwithstanding this testimony, their
expert generally "was critical of the Officers' conduct during
the incident." But their expert's other criticisms do not rebut
what he expressly acknowledged: "I believe [Hart] was a
threat to [the officers] when he had the knife in his hand. …
I believe that he presented an imminent threat to them."
While the expert's opinion that Hart posed an imminent
threat is not what makes it true, the larger point is that Hart's
threat to the officers was so obvious that an adverse expert
*had* to concede it because a non-responsive individual
approaching while holding out a knife is *unarguably* an
immediate threat. This issue, which is the "most important
single element of the three specified [*Graham*] factors,"
*Lowry v. City of San Diego*, 858 F.3d 1248, 1258 (9th Cir.

2017) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)), renders Officer Gomez's conduct objectively reasonable, *see Hayes v. County of San Diego*, 736 F.3d 1223, 1234 (9th Cir. 2013) ("[T]hreatening an officer with a weapon does justify the use of deadly force."); *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) (stating that "where a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force").

**b.**

Even though the immediacy of the threat posed by Hart as he approached with a knife is dispositive here, *see Estate of Hernandez by & through Hernandez v. City of Los Angeles*, No. 21-55994, 2024 WL 1203884, at \*4–5 (9th Cir. Mar. 21, 2024), the other *Graham* factors also arguably support the reasonableness of Gomez's conduct, and certainly do not undermine it.

The second factor is the severity of the crime at issue. After encountering the police officers, Hart approached the police officers while wielding a knife and refusing commands to drop it. Hart's approach while carrying a deadly weapon may have constituted an assault on the police officers. Cal. Penal Code §§ 217.1, 240 (defining "assault" as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another"). He also willfully resisted Officer Gomez's commands to "drop the knife," a form of resisting arrest, and did so while exhibiting

a deadly weapon, both of which are also crimes in
California.[4] Cal. Penal Code §§ 148(a), 417.8.

It is true that analyzing the severity of crimes committed
against the officers in a case like this ties this *Graham* factor
almost inextricably to the immediate threat factor. But that
is hardly surprising because many of the actions constituting
an immediate threat to others are also crimes. If someone is
actively murdering those around him, for example, he is both
committing a serious crime *and* posing an immediate threat
to anyone near him. The severity of the crime is thus very
often related to or the cause of the heightened and immediate
threat. *See Lowry*, 858 F.3d at 1258 (concluding that a
suspect posed an immediate threat in part because he was in
the process of committing burglary). This will often be the
case unless, unlike here, the crime committed is temporally
separate from the interaction with police. *See Browder*, 929
F.3d at 1136. Because the crimes Hart committed
contributed to the immediacy of his threat to Officers Gomez
and Velez, the second *Graham* factor does not weigh against

---

[4] California courts have concluded that California Penal Code Section
148 "penalizes even passive delay or obstruction of an arrest, such as
refusal to cooperate." *People v. Curtis*, 74 Cal. Rptr. 713, 718 n.6 (Ct.
App. 1969), *disapproved on another ground in People v. Gonzalez*, 275
Cal. Rptr. 729, 750 (Ct. App. 1990). California courts have held that
Section 148 cannot be supposed to "criminalize[] a person's failure to
respond with alacrity to police orders," but where the suspect acts
defiantly, such passive obstruction has been held to satisfy Section 148.
*In re Muhammed C.*, 116 Cal. Rptr. 2d 21, 24 (Ct. App. 2002) (citation
omitted); *see also In re J.C.*, 176 Cal. Rptr. 3d 503, 507 (Ct. App. 2014)
(concluding Section 148 was satisfied where the suspect "did not comply
with the officer's order to sit down and calm down, or with his
subsequent order to submit peacefully to detention"). Here, Hart not
only failed to drop the knife when commanded, he affirmatively
approached the officers with the knife in defiance of that command.

the reasonableness of the use of force. *See Ames v. King Cnty., Washington*, 846 F.3d 340, 348–49 (9th Cir. 2017) (finding that the severity of the crime factor weighs in defendant's favor when the crime, even if minor in nature, prolongs or exacerbates an ongoing emergency); *Bernal v. Sacramento Cnty. Sheriff's Dept.*, 73 F.4th 678, 692 (9th Cir. 2023) (same).

**c.**

The final *Graham* factor is whether Hart was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. As discussed above, Hart failed to comply with orders to drop the knife he carried. Plaintiffs cite *Bryan v. MacPherson* in arguing that, while "passive resistance" can support the use of force, "the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." 630 F.3d 805, 830 (9th Cir. 2010). We have also explained that "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

But here, Hart's conduct objectively amounted to more than mere "passive resistance." Not only did Hart fail to comply with the order to drop the knife, but importantly he also *approached* the officers while brandishing that knife. The circumstances in this case are therefore unlike *Bryan* where the officer "was confronted with a half naked, unarmed, stationary, apparently disturbed individual shouting gibberish at a distance of approximately twenty feet." 630 F.3d at 828. Nor are they like those in *Nelson*, where the plaintiff failed to leave when commanded, but committed no other acts of aggression. 685 F.3d at 874.

This case is also unlike *Glenn v. Washington County*, where this court determined that the suspect did not actively resist arrest because, although he "remained in possession of the pocketknife despite officers' commands to put it down," he "stayed in the same position from the time officers arrived and took no threatening actions (other than noncompliance with shouted orders)." 673 F.3d 864, 874–75 (9th Cir. 2011). Here, Hart was not simply holding a knife—he approached the officers with the knife while failing to comply with the officers' commands. This active resistance satisfies *Graham*'s final factor.

Ultimately, it is the totality of the circumstances that lead us to conclude that *Graham*'s standard is satisfied. *See id.* at 872 ("We examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case …." (internal quotations and citation omitted)). To repeat: if Hart had merely possessed a knife, the use of deadly force would not have been justified here. Likewise, Hart's failure to comply with the officers' commands, standing alone, would not have justified it. But Hart failed to comply with the officers' commands to drop the knife and instead rapidly approached them while wielding it. These facts, together, made Hart an immediate threat to the officers and justified Officer Gomez's use of deadly force.

**d.**

Besides the three *Graham* factors, Plaintiffs argue that additional factors are relevant to the analysis, including the officers' pre-shooting conduct, the availability of less intrusive alternatives, Hart's apparent mental illness, and the officers' failure to warn that they would shoot.

While California state law does factor pre-shooting conduct into whether an officer acts "reasonably when using deadly force," *Hayes*, 305 P.3d at 256, "[t]he Fourth Amendment is narrower and places less emphasis on pre[-]shooting conduct," *Vos*, 892 F.3d at 1037 (internal quotations and modifications omitted). And though "[t]he events leading up to the shooting, such as the officer's tactics, are encompassed in [the] facts and circumstances" a court can consider,[5] *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1087 (9th Cir. 2017), one cannot "establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided," *Billington v Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002), *abrogated on other grounds by County of Los Angeles v. Mendez*, 581 U.S. 420 (2017). Plaintiffs argue that pre-shooting conduct is relevant to the Fourth Amendment analysis, but when it comes to identifying what *specific* pre-shooting conduct makes Officer Gomez's conduct objectively unreasonable, Plaintiffs simply argue that the officers could have moved to a different location in the yard. Plaintiffs point out that the backyard was roomy and had patio furniture, and so the officers could have repositioned and potentially put the patio table between themselves and Hart. But even if they had repositioned within the backyard,

---

[5] While we sometimes consider pre-shooting conduct, other circuits do not. *See, e.g.*, *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005) ("[T]he reasonableness of the officer's actions in creating the dangerous situation is not relevant to the Fourth Amendment analysis; rather, reasonableness is determined based on the information possessed by the officer at the moment that force is employed."); *Gardner v. Buerger*, 82 F.3d 248, 254 (8th Cir. 1996) (requiring that the plaintiff "must present evidence that the seizure itself, not its prologue, was unreasonable"); *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992) ("[P]re-seizure conduct is not subject to Fourth Amendment scrutiny.").

there is no evidence to indicate that Hart would have been then unable to continue to approach them with the knife. Plaintiffs cite their police practices expert, who opined that "tactical repositioning is often utilized for officer safety." But the district court determined that the expert's statement that Gomez could have engaged in such "tactical repositioning" was an impermissible opinion about the "knowledge and state of mind of the officers," and Plaintiffs do not challenge this determination. Thus, Plaintiffs' argument is based on speculation that repositioning in the backyard was an *available* alternative in this case. This speculation does not refute the officers' testimony that the condition of the side yard prevented them from retreating. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

Nor does Hart's mental illness change the outcome in this case. While "whether the suspect has exhibited signs of mental illness is one of the factors the court will consider," this court has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1078 (9th Cir. 2019) (quoting *Vos*, 892 F3d at 1034 n.9). Ultimately, that an individual who poses an immediate threat may be mentally ill does not remove the case from the *Graham* analysis performed above, and any mental health crisis Hart experienced is considered in view of the surrounding circumstances. Here, Hart approached the officers while holding a knife after ignoring a command to drop it. This case is therefore unlike *Glenn*, where our court concluded that a jury could find an unreasonable use of force when the mentally-ill suspect was holding a "pocketknife with a three-inch blade, which he did not brandish at

anyone" and where that individual "stayed in the same position from the moment the officers arrived and showed no signs of attempting to move until after he was fired upon." 673 F.3d at 873–74.

Similarly, while "[o]ur cases demonstrate that officers provide warnings, where feasible, even when the force used is less than deadly," *Deorle*, 272 F.3d at 1284, a warning is required only "where feasible," *Garner*, 471 U.S. at 11–12; *see also Smith v. Agdeppa*, 81 F.4th 994, 1006 (9th Cir. 2023). Here, given the speed at which the unfortunate events unfolded, it was not unreasonable for Officer Gomez to forgo a verbal warning and take action to protect himself and his partner from an immediate threat.

**2.**

Officer Gomez's conduct did not violate the Fourth Amendment, but even if it had, he would still be entitled to qualified immunity because he did not violate clearly established law. To deny qualified immunity, not only must a constitutional right be violated, but that right must be "clearly established" at the time. *Wesby*, 583 U.S. at 62–63. To be clearly established, there need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). While in the "rare" case a clearly established right may be obvious, clearly establishing a right usually requires "'controlling authority' or a robust 'consensus of cases of persuasive authority.'" *Wesby*, 583 U.S. at 63, 64 (quoting *al-Kidd*, 563 U.S. at 741–42). The burden is on Plaintiffs to make the showing, *Isayeva*, 872 F.3d at 946, that "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was

violating it," *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (citation omitted). As discussed below, none of the cases Plaintiffs identify would have put Gomez on notice that his actions in this case would be unlawful.

Plaintiffs first point to *Deorle*. As an initial matter, the Supreme Court has "instructed [us] not to read [our] decision in [*Deorle*] too broadly in deciding whether a new set of facts is governed by clearly established law." *Id.* at 1154. Even looking beyond this rare instruction from the Supreme Court about how to apply our circuit's own precedent, "the differences between [*Deorle*] and the case before us leap from the page." *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 614 (2015). In *Deorle*, a police officer fired a beanbag round into the face of a man who was "unarmed, … had generally obeyed the instructions given him by various police officers, and had not committed any serious offense." 272 F.3d at 1275. By contrast, Hart was armed with a knife, failed to drop the knife when commanded, and approached the officers while brandishing the knife. Additionally, the officers in *Deorle* had "thirty to forty minutes" to plan their course of action, *id.* at 1276, while Gomez and Velez were responding quickly to an emergency suicide situation. In light of the extensive dissimilarities between this case and *Deorle*, extending *Deorle* here would be directly at odds with the Supreme Court's instruction to read *Deorle* narrowly.

Plaintiffs next rely on *Vos*, but that case is also factually distinguishable. In *Vos*, the officers saw Vos standing inside a 7-Eleven, yelling and "pretending to have a gun." 892 F.3d at 1029. The officers had about twenty minutes to plan their action. *Id.* at 1029–30. Then, the officers—one bearing "a 40-millimeter less-lethal projectile launcher" while the others had traditional firearms—entered the 7-Eleven to engage

Vos. *Id.* When they did, he approached them while holding what they initially believed to be scissors, but what turned out to actually be a "pronged metal display hook." *Id.* One officer told Vos to "[d]rop the weapon," but when he failed to comply, they fired at him with both the less-lethal and lethal weapons, striking him four times and killing him. *Id.*

Our court in *Vos* held that "a reasonable jury could [have found] that the force employed was greater than [was] reasonable under the circumstances." *Id.* at 1034 (internal quotations omitted). In doing so, we relied in part on both the fact that one of the officers was armed with a 40-millimeter less-lethal firearm and the extended timeline available to "coordinate a plan for their use of force." *Id.* at 1033–34. Here, while an officer armed with a 40-millimeter less lethal weapon was en route, he did not arrive before the officers engaged with Hart. And unlike the situation in *Vos*, in which police officers had twenty minutes to develop a tactical plan, Officers Gomez and Velez were responding to an emergency suicide situation in which time was of the essence. They had only seventeen seconds from when they arrived on the scene until Hart advanced towards them with a knife. As such, the factual scenario Officers Gomez and Velez faced was sufficiently different from that in *Vos* that Gomez would not have been on notice from that case.

Plaintiffs next suggest that, if *Deorle* and *Vos* fail to clearly establish Gomez's violation, *Browder* nonetheless decides the issue. As an initial matter, *Browder* was decided after the events of this case, so it could not have informed Gomez that his conduct was unlawful. *See al-Kidd*, 563 U.S. at 741 (requiring "*existing precedent*" to put "the statutory or constitutional question beyond debate" (emphasis added)). And even if *Browder* were relevant to whether the law at issue here was clearly established, the facts of that

case would similarly fail to clearly control this one. In *Browder*, an officer arrived on the scene after an individual (Nehad) had reportedly threatened a store employee with a knife. 929 F.3d at 1130. When the officer first saw Nehad, he found Nehad fiddling with something but "told … investigators that he had not seen any weapons." *Id.* at 1131. Within five seconds, the officer fatally shot Nehad, who turned out to have been carrying a blue pen. *Id.* In contrast to Hart's active suicide attempts and rapid movement toward the officers, Nehad had not harmed himself or others. And even though the officer later changed his story to the effect that he thought Nehad had been carrying a knife, this testimony was disputed, even by his own earlier statements. *Id.* at 1133. Here, it is undisputed that Hart wielded a knife as he approached the officers. As such, *Browder* could not be read to clearly establish that Gomez's conduct violated Hart's rights.

Plaintiffs have the burden of showing that the law was clearly established. *Isayeva*, 872 F.3d at 946. None of the cases Plaintiffs have identified—*Deorle*, *Vos*, or *Browder*— put the "constitutional question beyond debate" that the "violative nature of [Gomez's] particular conduct [was] clearly established." *al-Kidd*, 563 U.S. at 741–42. As such, Plaintiffs have failed to show that Hart's rights were "clearly established." *Wesby*, 583 U.S. at 62–63 (quoting *Reichle,* 566 U.S. at 664).

Because Plaintiffs have not shown that Officer Gomez's conduct was objectively unreasonable and therefore a violation of Hart's Fourth Amendment rights or that such rights were clearly established by existing precedent, Officer Gomez is entitled to qualified immunity.

## IV.

We have jurisdiction over this case because both whether disputed facts are material and whether qualified immunity applies are questions of law subject to our jurisdiction. Plaintiffs have shown neither (1) that Officer Gomez's conduct was objectively unreasonable and therefore a violation of Hart's Fourth Amendment rights, nor (2) that such rights were clearly established by precedent existing at the time of the conduct. The district court therefore erred in finding that Officer Gomez was not entitled to qualified immunity.

**REVERSED.**